IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

CEDRIC A. HEIDELBERG                                              PLAINTIFF

VS.                                               CIVIL ACTION NO. 2:18-cv-187-KS-FKB

ANDREW SAUL, Commissioner of
Social Security                                                   DEFENDANT

## REPORT AND RECOMMENDATION

### I. Introduction

Cedric A. Heidelberg filed a claim for disability insurance benefits and Supplemental Security Income on February 10, 2015, alleging an onset date of November 22, 2013. [14] at 14.[1] After his application was denied initially and upon reconsideration, he requested and was granted a hearing, which was held on July 18, 2017, before an administrative law judge (ALJ). *Id.* at 29-68. On January 4, 2018, the ALJ issued a decision finding that Heidelberg was not disabled. *Id.* at 11-23. The Appeals Council denied review. *Id.* at 1-4. Plaintiff, proceeding *pro se* and *in forma pauperis,* brought this appeal pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

After Plaintiff failed to comply with the Order Directing Filing of Briefs [6], the Court issued a Show Cause Order [15] on February 3, 2020, requiring him to show cause why the action should not be dismissed based on his failure to prosecute. The Show Cause Order [15] set another deadline for Plaintiff to file his memorandum brief. Plaintiff's mother, Catherine Heidelberg, timely submitted a brief and response informing the Court that Plaintiff had passed

---

[1] Citations are to the original pagination of the administrative record. Plaintiff's prior claim for benefits was denied on November 21, 2013. [14] at 136.

away on July 4, 2019, and stated that she intended to pursue the action.[2] [16]. Defendant has filed a brief [18], and this matter is ripe for review. Having considered the memoranda of the parties and the administrative record, the undersigned recommends that the decision of the Commissioner be reversed, and that this matter be remanded for further consideration.

## II.  Facts and Evidence

Heidelberg was born on July 27, 1982, and was 35 years old at the time of the ALJ's January 4, 2018, decision. *Id.* at 23. He met the insured status requirements of the Social Security Act through December 31, 2016. *Id.* at 14. Heidelberg had an eighth-grade education and attained a GED. [16] at 1. His past relevant work dated back to 2011, when he was employed as a coil winder, which is classified as semi-skilled, light work. [14] at 21-22, 436.

In his application for benefits, Heidelberg alleged that he was disabled because of coronary heart disease, abnormal blood pressure, cardiomyopathy, bradycardia, hyperlipidemia, migraine headaches, angina, constant arm pains, and shortness of breath. *Id.* at 135. According to Heidelberg's mother, Plaintiff's cause of death was cardiac arrest. [16] at 6.

Heidelberg's health issues stemmed, in part, from a stab wound he suffered to his heart in 2003, which required coronary artery bypass graft surgery. [14] at 18, 344-345, 436, 521. The record contains treatment notes by Heidelberg's cardiologist, Dr. Wassim E. Mouannes, from two different time periods, August 2011 to March 2012 and March 2015 to February 2017. *Id.* at 339-360, 444-487. Dr. Mouannes's notes from September 2011 observe that an angioplasty procedure failed to stent a "99% subtotal occlusion of the distal left anterior descending artery"

---

[2] As Plaintiff was divorced, without children, *see* [4] at 3, [14] at 41, benefits are payable to his surviving parent or parents. *See* 42 U.S.C. § 404(d)(3). Because Ms. Heidelberg is proceeding *pro se*, the Court liberally construes her response [16] as a motion to substitute pursuant to Rule 25(a) of the Federal Rules of Civil Procedure, which is hereby granted.

and that a heart surgeon "felt likely his cardiomyopathy is irreversible and he would not benefit from surgery." *Id.* at 358. Dr. Mouannes recorded that Heidelberg's ejection fraction was 40% at the time of the attempted catheterization and "35% by recent echo." *Id.* at 359. He commented that Heidelberg "would probably benefit from BIV AICD [biventricular pacemaker and automatic implantable cardioverter defibrillator] down the road if his ejection fraction does not improve." *Id.* at 359-360. He also counseled Plaintiff not to smoke any cigars, to start walking regularly, not to lift over thirty pounds, and to engage in no more than light work. *Id.* at 360. Dr. Mouannes's August 2011 statement of functionality limited Heidelberg to occasionally lifting up to 10 pounds and advised him not to lift or carry more than 10 pounds. *Id.* at 355. He also referenced a secondary diagnosis of a history of migraine headaches. *Id.* at 354. In March 2012, Dr. Mouannes observed that Heidelberg experienced migraine headaches and shortness of breath, and that he tired easily. *Id.* at 343.

On February 5, 2015, Heidelberg presented to an emergency room complaining of chest pain. *Id.* at 381. At that point, he indicated that he had been out of his medications for over one year. *Id.* Doctors admitted him to a nearby hospital for further observation. *Id.* at 389. While there, Heidelberg had an "abnormal" echocardiogram, which showed that his "[o]verall left ventricular ejection fraction [was] approximately 35%." *Id.* at 402. Based on the indication of a "non-ST elevation myocardial infarction," Heidelberg underwent a left heart catheterization, which demonstrated an overall left ventricular ejection fraction of 35%, 100% occlusion of the distal left anterior descending artery, "inferoapical and apical akinesis with overall moderate to severe left ventricular systolic dysfunction," and "no gradient across the aortic valve." *Id.* at

3

420-421.  After an overnight hospital stay, he was discharged with renewed medications and a recommendation to seek clinical reassessment.  *Id.* at 421.

Dr. Mouannes evaluated Heidelberg in March 2015 and commented that Heidelberg had been "lost for follow[-]up for three years." *Id.* at 446.  An electrocardiogram performed on Plaintiff in the doctor's office at that time "showed sinus rhythm with interventricular conduction delay/right bundle branch block, old inferior wall myocardial infarction, old anterolateral wall myocardial infarction." *Id.* at 447.  Dr. Mouannes observed that an "[e]chocardiogram study done in February 2015 showed severe left ventricular dysfunction, ejection fraction 35% with mild left ventricular hypertrophy and diastolic dysfunction." *Id.* at 447.  He concluded that Heidelberg had coronary artery disease, "stable with angina, status post recent cardiac catheterization that showed a chronically occluded mid" left anterior descending artery.[3]  *Id.*  He recommended that Heidelberg continue taking certain medications, lose weight, and follow a low salt, low cholesterol diet.  *Id.* at 448.  The doctor also advised him that "if his ejection fraction dropped below 35%, he may require a biventricular AICD."  *Id.*

A June 2015 stationary electrocardiogram indicated that he had sinus bradycardia, intraventricular conduction delay, a "probably recent" lateral myocardial infarction, and an "inferior myocardial infarction, of indeterminate age." *Id.* at 442.  X-rays taken at that time indicated "cardiomegaly, mild atelectasis and mild pleural fluid at the left costophrenic angle."  *Id.* at 441.

At the request of Dr. Mouannes, an echocardiogram (with color doppler) was performed on Heidelberg in July 2016.  *Id.* at 536-538. The test estimated that Heidelberg's left ventricular

---

[3] Dr. Mouannes attributed the chronic occlusion of Heidelberg's left anterior descending artery to trauma. *Id.* at 532.

4

ejection fraction was 30%, which, the interpreting doctor observed, was worse than his previous study.  *Id.* at 536.  In January 2017, Dr. Mouannes commented that Heidelberg would benefit from "AICD implantation versus Bi-V AICD in the future once he gets disability and Medicare insurance."  *Id.* at 467-468.

In July 2017, Dr. Mouannes completed a residual functional capacity assessment.  *Id.* at 540.  Dr. Mouannes's primary diagnosis of Heidelberg was severe cardiomyopathy, with secondary diagnoses of coronary artery disease, chronic right bundle branch block, and essential hypertension.  *Id.*  He concluded that Heidelberg's associated impairments and limitations would prevent him from working a 40-hour week.  *Id.*

Heidelberg had other health challenges.  The record demonstrates that Dr. Aremmia Tanious, a neurologist, treated Heidelberg from 2015 to 2017 for migraine headaches.  *Id.* at 491-512.  Heidelberg reported that his problems with migraines began around age 29.  *Id.* at 509.  By April 2017, Heidelberg reported to Dr. Tanious that his headaches had decreased in frequency, that he was "doing well" and that he did "not wish to make any changes in his current medication regimen."  *Id.* at 491.  However, citing Heidelberg's "numerous medical problems including severe migraine headaches, severe depression, and coronary artery disease," Dr. Tanious concluded in December 2015 that Heidelberg was "totally and permanently [disabled] from all gainful employment."  *Id.* at 512.

A consultative examiner, Dr. Azhar Pasha, described Heidelberg as overweight.  *Id.* at 436.  At Dr. Pasha's June 2015 examination, Heidelberg measured six feet tall and weighed 270.8 pounds.  *Id.* at 437.  He had a history of smoking and complained of chest pains.  *Id.* at 436.  He also suffered from coronary artery disease, cardiomyopathy, bradycardia, shortness of

5

breath, hypertension, migraine headaches, left arm pain due to angina, nearsightedness, and hypercholesterolemia. *Id.* at 437. Despite these conditions, Heidelberg had full range of motion in all of his peripheral extremity joints and normal full range of motion of the pelvic girdle and lumber spine. *Id.* Dr. Pasha commented that Heidelberg's gait was "not antalgic," and that he had normal grip and dexterity in both hands, with 5/5 motor strength in all extremities. *Id.* Nevertheless, Dr. Pasha observed that Heidelberg "[w]ould not be able to do a treadmill examination due to chest pain and shortness of breath on exertion." *Id.* After completion of Heidelberg's exam, Dr. Pasha discharged him home in stable condition, but also advised Heidelberg to seek care at an emergency room or with his primary care physician that same day. *Id.*

At his July 18, 2017, hearing, Heidelberg was represented by counsel. *Id.* at 29. Heidelberg testified that he was divorced, had no children, had no healthcare coverage, was unemployed, received no food stamps, and lived with his mother and grandfather. *Id.* at 41-42. He stated that his heart and migraine conditions were being monitored by doctors, and that the only treatment he received was his medications, along with some medical testing. *Id.* at 43. He testified he had experienced migraine headaches since 2010, and that currently he had migraines four days out of every week. *Id.* at 44. He coped with his migraine headaches by taking medication and isolating himself in a dark room with no noise or light. *Id.* He testified that doctors had not determined the cause of his headaches. *Id.* at 46. However, he did state that sometimes fumes would trigger headaches. *Id.* at 55. He attributed a 2010 motor vehicle accident to the first migraine he experienced, and he testified that he had not driven since that time because of safety concerns. *Id.* at 67.

6

As for his heart condition, Heidelberg testified that he experienced shortness of breath when walking, standing too long, talking, or being in dust or heat. *Id.* at 46, 55. He also related that he suffered from shooting pain running up and down his arm, as well as swelling in his hands and feet. *Id.* at 46-47, 57. He testified that the swelling in his legs was alleviated by elevating his legs anywhere from six to eight hours a day. *Id.* at 51. He stated that his shortness of breath and pain in his arms interfered with his self-care and prevented him from helping with chores at home. *Id.* at 49-50. He testified that his treating cardiologist had told him that he needed a pacemaker, and that if he did not get one, he "probably will die sometime in the near future." *Id.* at 43.

### III. The Decision of the ALJ

In evaluating Plaintiff's claim, the ALJ worked through the familiar sequential evaluation process for determining disability.[4] The ALJ found that Heidelberg had the following severe

---

[4] In evaluating a disability claim, the ALJ is to engage in a five-step sequential process, making the following determinations:

    (1)    whether the claimant is presently engaging in substantial gainful activity (if so, a finding of "not disabled" is made);

    (2)    whether the claimant has a severe impairment (if not, a finding of "not disabled" is made);

    (3)    whether the impairment is listed, or equivalent to an impairment listed, in 20 C.F.R. Part 404, Subpart P, Appendix 1 (if so, then the claimant is found to be disabled);

    (4)    whether the impairment prevents the claimant from doing past relevant work (if not, the claimant is found to be not disabled); and

    (5)    whether the impairment prevents the claimant from performing any other substantial gainful activity (if so, the claimant is found to be disabled).

*See* 20 C.F.R. § 416.920. The analysis ends at the point at which a finding of disability or non-disability is required. The burden to prove disability rests upon the claimant throughout the first four steps; if the claimant is successful in sustaining her burden through step four, the burden then shifts to the Commissioner at step five. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

impairments: coronary artery disease, cardiomyopathy, and obesity. *Id.* at 16. The ALJ specifically found that Heidelberg's migraine headaches, hypertension, and hypercholesterolemia were not severe impairments. *Id.* The ALJ concluded that none of Heidelberg's impairments met the Listings or was equivalent in severity to a listed impairment. *Id.* at 17. In particular, the ALJ determined that Heidelberg did not meet Listing 4.00 for the cardiovascular system, including 4.02, 4.04, or 4.05. *Id.* With regard to Listing 4.02, the ALJ acknowledged that Plaintiff's July 2016 echocardiogram showed that he had an ejection fraction of 30%, but pointed out that the ejection fraction had previously been higher, and that there was no evidence that the 30% ejection fraction was "sustained." *Id.* The ALJ also concluded, without discussion, that Heidelberg did not meet the paragraph B criteria of Listing 4.02, nor did he meet Listing 4.04 or have the recurrent arrhythmias required by Listing 4.05. *Id.*; *see also* [18-1] (Listings 4.02, 4.04).

After considering the "entire record," the ALJ concluded that Heidelberg had the residual functional capacity to perform sedentary work, except that he should only occasionally climb, balance, stoop, kneel, crouch, or crawl. *Id.* at 17. Furthermore, the ALJ commented that "although treatment notes show medical findings consistent with establishing severe impairments, the evidence fails to support limitations to the extent alleged by claimant." *Id.* at 18. The ALJ stated that reports after 2012 "fail to substantiate significant decline or worsening of the claimant's cardiac status." *Id.* at 19. The ALJ found that Plaintiff was unable to perform any past relevant work as a coil winder, which was performed at the semi-skilled, light level. *Id.* at 21-22. The ALJ observed that Plaintiff was a younger individual of age 31 and had a limited education. *Id.* at 22. The ALJ determined that transferability of job skills was not material to the

8

determination of disability because Heidelberg was "not disabled" under the Medical-Vocational Rules. *Id.* After consulting with a vocational expert, and considering Heidelberg's age, education, work experience, and residual functional capacity, the ALJ determined that there were at least three jobs in the national economy that Heidelberg could perform. *Id.* at 22-23. The ALJ identified the jobs of lens inserter (sedentary, unskilled), escort vehicle driver (sedentary, unskilled), and semiconductor assembler (sedentary, semi-skilled). *Id.* Thus, the ALJ found that Plaintiff was not under a disability from November 22, 2013, through the date of the decision, January 4, 2018. *Id.* at 23.

## IV. Standard of Review

This Court's review is limited to an inquiry into whether there is substantial evidence to support the Commissioner's findings, *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971), and whether the correct legal standards were applied, 42 U.S.C. § 405(g) (2006). *Accord Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). The Fifth Circuit has defined the "substantial evidence" standard as follows:

> Substantial evidence means more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It must do more than create a suspicion of the existence of the fact to be established, but "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence."

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). In applying the substantial evidence standard, the Court must carefully examine the entire record, but must refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.

9

1995). Hence, if the Commissioner's decision is supported by the evidence, and the proper legal standards were applied, the decision is conclusive and must be upheld by this Court. *Paul v. Shalala*, 29 F.3d 208, 210 (5th Cir. 1994), *overruled on other grounds, Sims v. Apfel,* 530 U.S. 103 (2000).

## V. Discussion

Plaintiff argues that the ALJ's decision should be reversed because Heidelberg met Listings 4.02 for chronic heart failure and 4.04 for ischemic heart disease. [16] at 1. The remainder of the brief is devoted to summarizing his health care records. The government responds that the evidence demonstrates that Plaintiff failed to meet Listings 4.02 and 4.04, and that he had gaps in treatment.

Even though an ALJ may make a "global statement that she considered opinion evidence in accordance with applicable regulations, courts should not accept or rely on such a statement. The courts instead look to the substance of ALJ decisions to determine what the ALJ considered and whether the ALJ applied the correct legal standards." *Bentley v. Colvin,* No. 13-CV-4238-P, 2015 WL 5836029, at *9 (N.D. Tex. Sept. 30, 2015).

In this case, the entirety of the ALJ's analysis of whether Plaintiff met Listings 4.02, 4.04, or 4.05 consisted of a mere four conclusory sentences. [14] at 17. Moreover, the ALJ failed to address relevant medical evidence and to adequately discuss the factors supporting her conclusion that Plaintiff did not meet any of these listings. For example, the ALJ acknowledged that Plaintiff's most recent echocardiogram, which showed a 30% ejection fraction, met the A criteria of Listing 4.02,[5] but the ALJ appears to have failed to consider fully the B criteria of

---

[5] The ALJ commented that "there is no evidence that [Heidelberg's] ejection fraction level [of 30%] was sustained," but the A criteria does not require that the level be "sustained." Rather, the A criteria of Listing 4.02 requires an

10

Listing 4.02.  Instead of addressing the specific requirements in the B criteria, the ALJ simply makes the conclusory statement that "there is no evidence . . . that the claimant has had chronic heart failure meeting the B criteria of listing 4.02." *Id.*  But the B criteria includes "[i]nability to perform on an exercise tolerance test . . . due to . . . [d]yspnea . . . or chest discomfort," [18-1] at 1, and the medical record indicates that Heidelberg "[w]ould not be able to do a treadmill examination due to chest pain and shortness of breath on exertion." *Id.* at 437.

Without a more detailed explanation, the Court simply cannot discern whether the ALJ's conclusion that Plaintiff failed to meet Listings 4.02, 4.04, and 4.05 is based on substantial evidence.  *See Audler v. Astrue,* 501 F.3d 446, 449 (5th Cir. 2007)("Absent some explanation from the ALJ to the contrary, [the claimant] would appear to have met her burden of demonstrating that she meets the Listing requirements . . . and therefore [the claimant's] substantial rights were affected by the ALJ's failure to set out the bases for [the] decision at step three.").  The record presented is, therefore, insufficient to determine whether all of the evidence was considered and whether the ruling was supported by substantial evidence.  Accordingly, this matter should be remanded.

## VI. Conclusion

For the reasons stated above, the undersigned recommends that this matter be remanded to the Commissioner for further consideration and explanation as to whether Heidelberg met Listings 4.02, 4.04, and 4.05.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation

---

"ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure)," which Heidelberg's July 2016 echocardiogram appears to meet.  *See* [14] at 535-538.

within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636, *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

      RESPECTFULLY SUBMITTED, this the 30th day of July, 2020.

                                      /s/ F. Keith Ball
                                    UNITED STATES MAGISTRATE JUDGE